[No. 28333. *En Banc.* February 10, 1941.]

THE STATE OF WASHINGTON, *on the Relation of Charles
H. Todd et al., Plaintiff,* v. CLIFF YELLE, *as State
Auditor, Respondent.*[1]

[1]Reported in 110 P. (2d) 162.

444

*Weter, Roberts & Shefelman, Charles H. Todd,* and *Edward J. Reilly,* for relators.

*The Attorney General* and *W. A. Toner, Assistant,* for respondent.

ROBINSON, C. J.—The relators are members of the house of representatives of the state legislature, and have been in attendance since it began its current ses-

sion at Olympia on January 13th. Invoking the original jurisdiction of this court, they pray for a writ of mandate peremptorily directing the state auditor to issue warrants reimbursing them for sums which they allege they have necessarily incurred by reason of their absence from their respective places of residence while thus engaged in the service of the state. The amounts involved are set out on vouchers sworn to by the relators and duly certified by the speaker of the house. To those vouchers are attached, as exhibits, the receipts of payees showing that the sums for which reimbursements are claimed were, on or after January 13th, actually expended for lodging and subsistence. The relators claim the right of reimbursement by virtue of the provisions of chapter 4 of the Session Laws of 1941, which was passed by the senate on January 15th, by the house on January 16th, and approved by the governor on January 21st. We quote the act in its entirety:

"AN ACT Appropriating the sum of forty thousand dollars ($40,000.00), or so much thereof as may be necessary for the actual and necessary expenses of the members of the Legislature for lodging and subsistance actually incurred and paid by them while absent from their places of residence in the service of the State and declaring an emergency.

"BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF WASHINGTON:

"Section 1. That there is hereby appropriated out of the general fund of the State of Washington the sum of forty thousand dollars ($40,000.00), for the actual and necessary expenses of the members of the Legislature, actually expended by them for subsistence and lodging while absent from their usual places of residence in the service of the State, at a rate not exceeding five dollars ($5.00) per day, to be evidenced by vouchers with the necessary receipts showing such expenditures.

"Sec. 2. This act is necessary for the support of the state government and shall take effect immediately."

The case presents but one question for decision, and that, a pure question of law. It appears from the return of the respondent auditor that the sole reason why he refuses to issue the warrants is that he fears that, if he does so, he and his sureties may be called to account upon the ground that the act above quoted is void and of no effect as being violative of § 23 or § 25 of Art. II of the state constitution. The relators assert that this fear is groundless. Section 23 reads as follows:

"§ 23. Each member of the legislature shall receive for his services five dollars for each day's attendance during the session, and ten cents for every mile he shall travel in going to and returning from the place of meeting of the legislature, on the most usual route."

Similar provisions are found in the constitutions of many of the states. An illustrative example is found in § 29 of Art. IV of the constitution of our neighboring state of Oregon. That section reads:

"§ 29. The members of the legislative assembly shall receive for their services a sum not exceeding three dollars a day, from the commencement of the session; but such pay shall not exceed in the aggregate one hundred and twenty dollars for per diem allowance for any one session. When convened in extra session by the governor, they shall receive three dollars per day; but no extra session shall continue for a longer period than twenty days. They shall also receive the sum of three dollars for every twenty miles they shall travel in going to and returning from their place of meeting, on the most usual route. The presiding officers of the assembly shall, in virtue of their office, receive an additional compensation equal to two-thirds of their per diem allowance as members."

Constitutional provisions are static, and properly and intentionally so, but the purchasing price of a dollar is not. No doubt, when the constitution of Oregon was adopted in 1859, a legislator could reasonably maintain himself, when absent from his usual place of residence,

upon three dollars per day plus three dollars for each twenty miles of travel; and, doubtless, a legislator could reasonably maintain himself at Olympia upon five dollars per day and mileage at ten cents per mile when our own constitution was adopted thirty years later. But it is no longer possible to conveniently do so, and has not been for a number of years. Chapter 4 was enacted by the present legislature with the hope and intent of providing a remedy for an admittedly unfortunate condition.

Before discussing the precise question presented for decision, and as a method of approach thereto, it seems desirable to clear away certain prevalent misunderstandings and misapprehensions regarding the general subject-matter. A widespread, but mistaken, impression exists that the people, by direct vote, decisively rejected the subject-matter of chapter 4 in the fall election of 1940. The fact is that in the fall election of 1940, the people rejected, by a decisive majority, a proposed constitutional amendment designed to add a new section to Art. III. This proposed section read as follows:

"Section 26. The people by initiative, or the legislature by appropriate enactment, may fix, change, raise or lower the salary of any constitutional or other officers of the state, including members of the legislature; *Provided, however,* The salary of the legislators shall not exceed Fifty Dollars per month. Any and all constitutional provisions to the contrary are hereby repealed."

Previous sections in Art. III, to-wit, §§ 14, 16, 17, 19, 20, 21, and 22, fix a maximum limit upon the salaries of the governor, lieutenant governor, secretary of state, treasurer, auditor, attorney general, and superintendent of public instruction. The adoption of the amendment would not only have repealed and cancelled all of these maximum salary provisions, but would also have authorized the legislature, without any check

whatever, to either raise or lower the salaries of all of these officials and all other state officers. Furthermore, it is perfectly plain that a voter might be quite willing that the legislators should receive reimbursement with respect to sums actually expended for lodging and subsistence when absent from their usual places of abode in the service of the state, and yet be altogether unwilling to grant them the power to vote themselves a salary up to fifty dollars per month, payable throughout their terms in office.

It is also widely, but mistakenly, believed that this court has heretofore decided the exact question presented by the relators, and adversely to their contention, in the case of *State ex rel. Banker v. Clausen,* 142 Wash. 450, 253 Pac. 805. That case was subsequently approved in *State ex rel. Mills v. Clausen,* 161 Wash. 700, 296 Pac. 1119, the *per curiam* opinion therein reciting that the two cases presented identical issues. At the hearing of this cause, the respondent, invoking the doctrine of *stare decisis,* vigorously contended that we are bound by those decisions, and must, therefore, refuse the writ prayed for in the case at bar. With this contention, we do not agree. The relator in the *Banker* case founded his alleged right to the writ upon a mere resolution which read as follows:

" 'Resolved, by the House of Representatives of the State of Washington:

" 'That the sum of five dollars ($5.00) be allowed to each member of the House of Representatives, for each day of the twentieth session of the legislature of the state of Washington for expenses incurred in attending the session of the legislature at the state capital, and that the speaker and the chief clerk be and they are hereby authorized to make out the necessary vouchers upon which warrants for the same will be drawn, the said sums to be paid out of moneys appropriated for the expenses of the twentieth legislature;' "

■   It is axiomatic that a writ of mandate can only be issued to enforce a right clearly founded in or granted by law.

■   It is equally clear that a house resolution is not a law. A law must be enacted either by popular initiative or by the legislature, and, when enacted by the legislature, must be by bill (Const., Art. II, § 18), and a bill cannot become a law until it is enacted by both houses (Art. II, § 22) and approved by the governor, or repassed over his veto (Art. III, § 12). Section 18 of Art. II of the constitution reads as follows:

"§ 18.   The style of the laws of the state shall be: 'Be it enacted by the legislature of the state of Washington;' *and no laws shall be enacted except by bill.*" (Italics ours.)

This section alone necessitated the result arrived at in the *Banker* case, and the result would have been completely justified by merely citing it, had the court preferred to summarily dispose of the matter.

The court might also have summarily disposed of the matter by pointing out that the resolution, upon which the relator founded his claim to the writ prayed for, attempted to carve out of the general appropriation made by the legislature for the expenses of that legislative session, five dollars per day, *not* for the expenses of the members of the legislature, but for the expenses of the members of the house of representatives only. This attempted diversion of funds was so plainly illegal that the court might well have found, without further consideration, that the relator could claim no legal right by virtue of the resolution.

The court, however, for some no longer remembered reason, preferred not to dispose of the matter summarily, but went on to make its decision upon two other grounds, one of which is wholly inapplicable to

the case at bar. The concluding words of the majority opinion are as follows:

"We are strongly of the opinion that the resolution in question does not provide for the payment of legislative expenses, but that it does attempt to allow funds to members to be used at will. The writ is therefore denied."

It, of course, cannot be said that the statute upon which the relators found their alleged right to the writ prayed for in this case attempts to allow funds "to be used at will." The funds involved in the instant case are reimbursements for sums

" . . . actually expended by them [members of the legislature] for subsistence and lodging while absent from their usual places of residence in the service of the State, . . . to be evidenced by vouchers with the necessary receipts showing such expenditures."

To what extent the fact that, by virtue of the resolution considered in the *Banker* case, five dollars per day was to be allowed, in gross, without any accounting or any kind of showing that it was actually required for the payment of expenses, or that it would be devoted to that purpose, affected the result of the case, it is impossible to determine. It is our opinion that the decision arrived at could have been placed upon that ground alone.

For the reasons above given, the result in the *Banker* case, and likewise in the *Mills* case, where the issues were adjudged to be the same, was unquestionably correct. But the situation presented in those cases was so different from that presented in this that no phase of the doctrine of *stare decisis* compels us to arrive at the same result.

██ Nor does the doctrine of *stare decisis*, as the court long ago held, speaking through Ellis, J., in *Ingham v. Harper & Son,* 71 Wash. 286, 128 Pac. 675, Ann.

Cas. 1914C, 528, apply to language used in an opinion which is unnecessary to the conclusion reached. To hold that the reasoning of the *Banker* opinion is not binding upon us is, of course, very far from saying that it should not be given most serious and respectful consideration. Decisions of the courts of other states are not controlling upon us, but in nearly every opinion of this court quotations are made therefrom because the reasoning therein, though not binding upon us, is cogent and persuasive.

Before further considering the opinion in that case, we will give brief attention to outside authority. The respondent relies chiefly upon the cases cited in the *Banker* case at page 461, Volume 142 of our state reports, and on page 809 of Volume 253 of the Pacific Reporter, supplemented by the following decisions handed down since that decision was rendered: *In re Wilkins,* 116 Neb. 748, 219 N. W. 9; *Dixon v. Shaw,* 122 Okla. 211, 253 Pac. 500, 50 A. L. R. 1232; *Peay v. Nolan,* 157 Tenn. 222, 7 S. W. (2d) 815, 60 A. L. R. 408; *Jones v. Hoss,* 132 Ore. 175, 285 Pac. 205.

The relators rely principally upon: *Christopherson v. Reeves,* 44 S. D. 634, 184 N. W. 1015; *State ex rel. Weldon v. Thomason,* 142 Tenn. 527, 221 S. W. 491; *State ex rel. Langer v. Kositzky,* 38 N. D. 616, 166 N. W. 534, L. R. A. 1918D, 237; *Scroggie v. Scarborough,* 162 S. C. 218, 160 S. E. 596, and *Jory v. Martin,* 153 Ore. 278, 56 P. (2d) 1093.

We have examined all of the cases above cited and others brought to our attention by counsel for the parties, but lack of time and space forbids their discussion in this opinion. Nor do we feel that such a discussion would be of particular value. In no one of the cases is the constitutional provision relating to the compensation of legislators exactly like our own. Of cases cited from other jurisdictions by the relators, the

case of *Christopherson v. Reeves, supra,* is, perhaps, nearest in point. It is, however, severely criticized in the opinion in the *Banker* case, and also in the Oregon case of *Jones v. Hoss.* On the other hand, the earlier opinion of the South Dakota court in *McCoy v. Handlin,* 35 S. D. 487, 153 N. W. 361, Ann. Cas. 1917A, 1046, L. R. A. 1915E, 858, a case upon which the opinion in *Christopherson v. Reeves* largely rests, is highly commended by the supreme court of South Carolina.

In our opinion, also, the reasoning of the Oregon court in the case of *Jones v. Hoss,* upon which the respondent largely relies, in so far as it relates to that article of the constitution of Oregon which corresponds to § 23 of Art. II of our own constitution, is largely, if not altogether, abandoned in the recent decision of the same court in *Jory v. Martin, supra.* Although the decisions cited by both parties are helpful, they are not at all determinative of the question: Does chapter 4 of the 1941 Laws of the state of Washington violate § 23 of Art. II of the state constitution? That, in the last analysis, must turn upon a fair construction of the constitutional provision.

██ Since we are considering whether or not an act of a state legislature violates a state constitution, it is elementary, and both parties to this controversy through their respective counsel admit, that the questioned act must be upheld unless some express or fairly implied limitation upon the legislature's power to enact it is found in the constitution. It is also elementary, and both parties admit, that, in construing the constitution, words are to be given the usual and ordinary meaning. It is further elementary, and both parties so admit, that all doubts as to whether or not a state legislature had the power to pass a given enactment must be resolved in favor of the legislature.

██ In approaching the problem, in so far as

raised by § 23 of Art. II, we adopt the analysis made by the five judges who signed the majority opinion in the *Banker* case:

"There are, of course, no words of express limitation in § 23 of article II, and it is our duty to determine what was meant by those who drew the provision nearly forty years ago. Relator earnestly contends that its authors meant that the legislature should receive five dollars per day and ten cents per mile as compensation, while the respondent just as earnestly contends that five dollars per day was intended as compensation for services, and the mileage was intended as an allowance for expenses. If the first construction be the correct one, then, as the constitution allowed nothing for expenses, the rule of *expressio unius est exclusio alterius* does not apply, and the legislature may properly act in the matter, but if the respondent is right and the constitution allows ten cents per mile as expenses, the *exclusio* rule does or may apply, and, if it does, the power of the legislature is thereby limited."

After making this analysis, the five judges reached the conclusion that the "first construction" was not the correct one, and applied the maxim *"expressio unius est exclusio alterius."* The four dissenting judges were of the opinion (1) that the first construction was correct; and (2) that, at the very least, either construction was permissible. The majority came very close to conceding this, for they said:

"Neither construction is so ungrammatical as to cause its rejection, and we must look to other rules for guidance."

For the convenience of the reader, we requote the section:

"§ 23.  Each member of the legislature shall receive for his services five dollars for each day's attendance during the session, *and* ten cents for every mile he shall travel in going to and returning from the place of meeting of the legislature, on the most usual route." (Italics ours.)

Since there are no technical words in the section, the opinion of an educated layman as to its intent is, in the first instance at least, as admissible as that of a judge or lawyer. Suppose this question be put to candidates for admission to the bar: What does the constitution provide that each member of the legislature shall receive for his services? A answers, five dollars for each day's attendance during the session, and ten cents for every mile he shall travel in going to and returning from the place of meeting of the legislature, on the most usual route. B answers, five dollars for each day's attendance during the session. Which of these answers is correct? The judges who sign this opinion are divided on that question. The majority are strongly inclined to believe that A's answer is correct. But the important and decisive fact is that each and all of them candidly admit that the matter is doubtful, and that no one can categorically say that either answer is unquestionably correct.

The doctrine of *expressio unius est exclusio alterius* is, therefore, of doubtful application, and, since it is not contended that a limitation of the power of the legislature to pass an act reimbursing its members for their expenditures for lodging and subsistence while away from their homes in the service of the state, can be read into § 23 on any other theory, it must follow that the whole matter is in doubt. Manifestly, then, this court cannot say that chapter 4, Laws of 1941, is violative of that section, since we must resolve all doubts respecting its constitutionality in favor of the act. That rule has been consistently applied throughout our judicial history. From the great number of quotations which could be made from our decided cases, we limit ourselves to two, the first from an opinion in a case decided in 1892, the second from an opinion in a case decided in 1938:

"If after the fullest investigation the court is in doubt as to whether or not the law is constitutional, the act will be given the benefit of such doubt and held valid and binding." *Board of Directors v. Peterson,* 4 Wash. 147, 149, 29 Pac. 995.

"It is presumed that the statute in question is constitutional and the burden rests upon appellant to establish clearly its invalidity." *State v. Hanlen,* 193 Wash. 494, 496, 76 P. (2d) 316.

█ We are also persuaded that the limitation contended for should not be read into § 23 by implication, by the fact that it clearly appears, from other sections of the constitution, that, when the framers of that instrument intended to put a limit upon official compensation, they used forthright language which left no room for implication. Consider § 14 of Art. III:

"§ 14. The governor shall receive an annual salary of four thousand dollars, which may be increased by law, *but shall never exceed* six thousand dollars per annum." (Italics ours.)

The same phrase "but shall never exceed" is used in §§ 16, 17, 19, 20, 21, and 22 of the same article in limiting the compensation of other state officers.

██ We come now to the second branch of the question presented: Does chapter 4 of the Laws of 1941 violate § 25 of Art. II of the state constitution? That section reads as follows:

"§ 25. The legislature shall never grant any extra compensation to any public officer, agent, servant, or contractor after the services shall have been rendered or the contract entered into, *nor shall the compensation of any public officer be increased or diminished during his term of office.*" (Italics ours.)

We are concerned with that portion of the section which we have italicized. At the hearing of this cause on February 7th counsel for the respondent stated in open court that he was of the opinion that this section

presented a more serious obstacle to the constitutionality of the act than is presented by § 23. Some of us are of the like opinion. The relators and all other members of the legislature are public officers, and chapter 4 of the Laws of 1941 was enacted during their term of office. Does it increase their compensation? On this branch of the case, respondent largely relies upon what his counsel refers to as the unanswerable logic of a paragraph in the opinion in *Jones v. Hoss*, 132 Ore. 175, 285 Pac. 205, which reads as follows:

"Such allowance for personal expenses is, in effect, additional compensation which the constitution expressly forbids. It seems to the writer that much ingenious reasoning is required to reach any other conclusion. If A pays B $5 per day for his services for a period of 30 days and then for the next 30 days pays him $5 per day and board, will it be argued that B's compensation has not been increased? This is a common sense view which we think would have appealed to those pioneer citizens who had to do with the making of the constitution. It is an interpretation which the legislature itself recognized from the adoption of the constitution in 1859 until the passage of the first resolution for incidental expenses in 1927. Such an interpretation by the legislature extending over a period of time in excess of half a century should and does have great weight with the court."

One of the reasons why we have, in the preparation of this opinion, somewhat neglected the cases from other jurisdictions is that, due to factual differences, there are so many instances where the same case supports, to some degree, both sides of the controversy. Here, we have that condition within the limits of a single paragraph. The first half of the paragraph above quoted is persuasively in favor of the respondent's position, but the second half favors the relators; for it is said therein—and we agree—that a legislative interpretation extending over a period in excess of half a

century should have great weight with the court. The legislative interpretation of this state for more than half a century has been to the effect that the allowance to public officers of reimbursement for sums necessarily expended, while away from their places of residence in the service of the state, is constitutionally permissible.

Time has not permitted complete research on this phase of the matter, but we have, so to speak, taken samples at random from the entire period which appear to fully justify the conclusion stated in the preceding paragraph. Our pioneer legislature which assembled within a few months after the constitution was adopted appropriated "for traveling expenses of superintendent of public instruction, $800.00." Laws of 1889-90, p. 29. A similar appropriation was made in 1891, and in that session traveling expenses were also appropriated for the attorney general. Laws of 1891, pp. 220, 221. Traveling expenses for both of these officers were again appropriated in 1893. Laws of 1893, p. 453. In one or the other of these early legislatures, although not all were present at the same session, there sat at least eight men who had participated in the framing of the constitution, John R. Kinnear, John McReavy, J. P. T. McCroskey, Edward Eldridge, M. M. Godman, H. W. Fairweather, and George H. Stevenson.

· As might be expected, the practice grew with the passage of time. By 1897, we find in the appropriation bill additional items for the traveling expenses of the governor and of the secretary of state. Laws of 1897, pp. 194, 195. In the appropriation bill of 1903, we find appropriations for all of the purposes heretofore mentioned, with an additional item for the traveling expenses of the state auditor. Laws of 1903, pp. 400, 401. In 1907, there is a new item for the traveling expenses of the lieutenant governor. Laws of 1907, p. 487. In

1909, there is an item of maintenance for the governor's mansion. Laws of 1909, p. 870. The mansion had been erected by virtue of an appropriation of $35,000, by chapter 49, Laws of 1907, and items for its maintenance regularly appear in the appropriation bills since 1909. In 1915, the legislature appropriated for "maintenance, furnishings, repairs and improvements," $9,000.00. There is another item in the appropriation bill of that year (Laws of 1915, chapter 56, p. 206) of such significance that we resort to quotation. The italics are ours:

"For the Lieutenant Governor's Office.

"Salary of lieutenant governor...........$2,400.00
"*Hotel bills,* while acting governor and
   *during sessions of the legislature,* and
   traveling expenses.....................  500.00

"Total ...........................$2,900.00"

Here is conclusive evidence that the legislature of 1915 construed an appropriation for hotel bills while attending the legislature as constitutionally permissible. And so did the 1917 legislature (Laws of 1917, p. 807), and the 1919 legislature (Laws of 1919, p. 174), and the 1921 legislature, although the designation then made was: "Hotel bills while attending sessions of legislature and when Acting Governor," and the amount was raised to $1,000.00. Laws of 1921, p. 582. The 1923 legislature made the same appropriation, using the same designation. Laws of 1923, p. 152; and so also in 1925, Laws of 1925, p. 128, and in 1927, Laws of 1927, p. 890. In 1929, a lump sum appropriation of $3,400 was made for: "Salary of Lieutenant Governor and hotel bills and traveling expenses while attending sessions of the legislature and when acting Governor." Laws of 1929, p. 637. This item does not appear in the appropriation bill passed at the last session. Apparently, somewhere along the line, just when we have not had

time to determine, the handling of such matters was put upon a different basis. We quote the following excerpts from the last general appropriation act (Laws of 1939, chapter 223, p. 936):

"The word 'operations' whenever used in this act, shall mean and include necessary traveling expenses of officers and employees, and all expenses necessary for supplies, material, services and maintenance of the various institutions, departments and offices of the state government, other than salaries and wages: . . . *And provided further,* That allowances made for subsistence and lodging for elective or appointive officers and employees while away from their domicile on state business shall equal actual expenses incurred therefor, but shall not exceed four dollars ($4.00) per diem for meals and lodging: . . . "

The legislative appropriations above mentioned were made while the public officers whose expenses they were designed to pay or reimburse were in office, but, so far as we know, no one has ever contended in or out of court that they constituted an increase of the "compensation" of such officers. There are decisions in other states, however, which throw light upon the question under discussion.

In *Kirkwood v. Soto,* 87 Cal. 394, 25 Pac. 488, it was contended that a statute providing that county superintendents of schools should be reimbursed for their traveling expenses violated a constitutional provision which read as follows:

" 'The compensation of any county, city, town, or municipal officer shall not be increased after his election or during his term of office.' "

The court, after stressing the fact that, since the adoption of the constitution, many acts had been passed providing for the payment of expenses necessarily incurred by public officers, and that their constitutionality had never been questioned, held the statute valid.

In *Milwaukee County v. Halsey,* 149 Wis. 82, 136 N. W. 139, a statute providing that each of the several judges of the circuit courts of the state should receive four hundred dollars per annum for his necessary expenses in addition to his salary, was held not to increase the compensation of the judges, within the meaning of § 26, Art. IV of the constitution providing that the "compensation of a public officer should not be increased or diminished during his term of office."

In *Cummings v. Smith,* 368 Ill. 94, 13 N. E. (2d) 69, a case decided in 1937, provisions permitting the payment of a lump sum of twenty dollars per day to visiting judges sitting in Cook county were involved. This was held, citing a great number of cases, not to be additional "compensation."

The fullest and, perhaps, the best discussion of the subject which has been called to our attention is that contained in *McCoy v. Handlin,* 35 S. D. 487, 153 N. W. 361, Ann. Cas. 1917A, 1046, L. R. A. 1915E, 858. That case involved the legality of a statute reading as follows:

" 'That whenever a judge of the Supreme Court whose legal residence shall be at some place other than the state capital shall have changed his place of actual residence to the capital, there shall be paid to such judge in consideration of expenses incident to removal to the capital, the increased expenses of living at a place other than his legal residence, the expenses of traveling to and from such legal residence the fixed sum of fifty dollars for each month payable upon the certified vouchers of such judge filed in the office of the state auditor.' "

The constitutional provision was much broader and more drastic in its terms than that with which we are concerned in the instant case. It read, in part:

" 'The judges of the supreme court . . . shall each receive such salary as may be provided by law,

consistent with this Constitution, *and no such judge shall receive any compensation, perquisite or emoluments for or on account of his office in any form whatever, except such salary:* . . .' " (Italics ours.)

The statute .was held constitutional. The opinion is especially valuable for its discussion of the legality of certain expense items allowed to the president of the United States and to Federal judges in spite of certain provisions in the Federal constitution prohibiting increases in compensation.

Counsel says, however, that the expenses of which we have been speaking are distinguishable from those for which reimbursement is provided in chapter 4, Laws of 1941, in that they are allowed while the officer is away from his regular place of work, while those provided for in chapter 4 are allowed to the officer while living where the work is performed. But to us it seems that these expense provisions, so to speak, have a common denominator, and that is, that they are made to reimburse the officer for expenditures made necessary by the fact that he is called away from his home in the service of the state. Most of the state officers, for whose expenses appropriations have been made throughout statehood, live permanently at Olympia. When they are compelled to spend a few days in Seattle, Spokane, or elsewhere, their house rent or the interest on the investment, if they own their homes, their fuel, light, water, and other maintenance charges, go on. It is for this reason that they are reimbursed with respect to lodging which they are compelled to pay for in some other town or locality.

It is the same, except in isolated cases, with respect to the members of the legislature. They do not break up or abandon their homes when they come to Olympia for a legislative session. The expenses there continue as usual. We have no doubt but that many state

officers are absent from Olympia and on expense account a great deal more than sixty days in each biennium, though the aggregate be made up of a day or two, or a week at a time. Can it make any difference that the legislator is away from his home for sixty consecutive days?

In our opinion, the reimbursements provided for in chapter 4, Laws of 1941, do not increase the compensation of the members of the legislature, within the meaning of § 25, Art. II of the constitution.

It is urged upon us that, if this be the law, the next legislature, or even this, can pass an act providing for reimbursement for expenses up to ten, twenty, or more dollars per day without let, hindrance, or checks. It is not within our province to decide what the law ought to be; we are limited to deciding what it is. But if we may say so, we are not greatly perturbed by the prospect imagined. Something must be allowed to the honesty and good faith of the members of the legislature; and, indeed, their honesty and good faith is our sole protection in many matters more weighty and important than this. Furthermore, there are checks. If they should attempt to appropriate a manifestly unfair and exorbitant sum for their own uses, they would promptly hear from an outraged public.

The relators will be granted the writ prayed for, and, since the act which they seek to enforce has been effective since January 21st and the respondent's only reason for not complying with it is on account of his doubt as to its constitutionality, it is ordered and directed that the writ issue forthwith.

STEINERT, BLAKE, DRIVER, BEALS, SIMPSON, and JEFFERS, JJ., concur.

MAIN, J. (dissenting)—I am not in accord with the majority opinion in this case. This being an emergency case, time will not permit me to go into the

matter in detail. I shall state my position only briefly.

I see no substantial distinction between this case and the case of *State ex rel. Banker v. Clausen,* 142 Wash. 450, 253 Pac. 805. It is true that, in that case, only a resolution had been passed, but the court, in stating the question, said:

"The real question here to be determined is whether or no the legislature, or either house thereof, has the power under our constitution to provide for the payment to individual members of expenses incurred by them in attending its session at the state capitol."

Following this, the opinion was written on the theory that the legislature itself had no such power.

It is my view that the *Banker* case should be adhered to or overruled. As I view it, that case was correctly decided, and I think it should be adhered to.

I therefore dissent.

MILLARD, J. (dissenting)—That the compensation of the members of the legislature should be increased, I agree. I am in accord with the view that "a legislative interpretation extending over a period in excess of half a century should have great weight with the court." By the same token, the interpretation by the voters, whose interpretation at the polls as legislators is contrary to the legislature's and this court's present interpretation, should have great weight with this court and with the legislature.

The allowance for personal expenses is, as stated in *Jones v. Hoss,* 132 Ore. 175, 285 Pac. 205, "in effect, additional compensation which the constitution expressly forbids." That was the interpretation of the legislature for almost half a century, and that is the interpretation of the electorate as legislators, who again refused at the last election to increase the compensation of the members of the legislature.

The application for the writ should be denied.